UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**JASON WILBUR ARMS,**

 Plaintiff,

v.                      Case No. 22-CV-926-SCD

**COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,**

 Defendant.

---

## DECISION AND ORDER

---

 Jason Arms applied for disability benefits after he injured his shoulder and elbow at work and later suffered a near-death cardiac arrest. The Commissioner of the Social Security Administration denied the application, and, after a hearing, an administrative law judge found Arms capable of performing light exertional work with some restrictions. Arms seeks judicial review of that decision, arguing that the ALJ erred in evaluating the opinions of his treating orthopedic surgeon. I agree that the ALJ reversibly erred when analyzing several of the surgeon's opinions. However, because the record does not require a finding of disability, I will reverse the decision denying Arms disability benefits and remand the matter for further proceedings, rather than order an award of benefits.

### BACKGROUND

 In 2017, Arms applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively, claiming that he became disabled and unable to work in 2015 due to various physical and mental impairments.

I. **Medical Background**

On March 2, 2015, Arms injured his right shoulder and left elbow while working as a welder and metal fabricator. R. 562.[1] He filed a worker compensation claim and was referred to physical therapy. After Arms tried unsuccessfully to return to light duty work, he was referred to Mark Wichman, an orthopedic surgeon. Dr. Wichman noted that Arms showed signs of impingement and possibly a right rotator cuff or labral tear. R. 565–66. He excused Arms from work and ordered an MRI. The MRI revealed rotator cuff tendinosis and findings suggestive of a labral tear. R. 567–69. In August 2015, Dr. Wichman indicated that Arms could return to work without restrictions for two hours a day and with a twenty-pound lifting restriction and no repetitive reaching away from the body for the rest of the workday. R. 606. A few weeks later, Arms reported worsening symptoms in his shoulder and elbow. R. 621.

In October 2015, Arms underwent surgery to repair his torn right shoulder. R. 640–42. He remained out of work post-surgery and participated in physical therapy. R. 651. Despite complaining about ongoing pain in his shoulder and elbow, Arms made progress with restoring strength and range of motion. R. 654–77. In June 2016, Dr. Wichman released Arms back to work fives hours a day with a twenty-pound lifting restriction and no repetitive work with his arms outstretched away from his body. R. 677. Dr. Wichman updated the work restrictions the following month, precluding Arms from repetitive overhead away-from-body use of his right upper extremity and pushing, pulling, or lifting no more than twenty pounds. R. 684. In August 2016, Dr. Wichman indicated that Arms had reached a healing plateau. R. 692. He restricted Arms to occasionally lifting forty pounds from waist to eye level, occasionally pushing or pulling fifty-five pounds, and two-hand carrying fifty pounds.

---

[1] The transcript is filed on the docket at ECF No. 10-2 to ECF No. 10-25.

In February 2017, Arms experienced sudden cardiac arrest at his home. R. 414. He was resuscitated and transported to a hospital, and a catheterization revealed coronary artery disease. R. 414, 492–93. Upon discharge, Arms was provided a wearable defibrillator. R. 531. He later told his cardiologist that the defibrillator's alarm went off "fairly frequently" when he was exerting himself. *Id.* Arms underwent a stress test a few months later. R. 3104. The cardiologist indicated that the findings represented a normal study and that there was no evidence of myocardial ischemia. Arms subsequently complained about intermittent angina-like symptoms, a worsening memory, and often feeling fatigued. R. 3133–34. In December 2017, he had an implantable cardioverter defibrillator placed inside his chest. R. 3012. Arms' heart rate remained controlled in the months after the ICD surgery, though he sometimes reported shortness of breath. R. 4818. He quit smoking, cut down his alcohol use, and was instructed to continue taking his heart medication. R. 4818–20.

Meanwhile, Arms continued to see Dr. Wichman for his right shoulder issue. He reported doing "reasonably well" but still had some anterior pain, so Dr. Wichman administered several cortisone injections. *See* R. 696–705. In January 2018, Arms told Dr. Wichman that he had never really done that well since his shoulder surgery. R. 1647–48. He also started complaining about "numbness and tingling down the right arm, particularly with more activity." R. 1647. Dr. Wichman diagnosed refractory right shoulder pain and radiculitis of the right upper extremity and indicated that he thought Arms was headed toward "some type of medical retirement" given his shoulder issues. R. 1648. Because Arms complained about radiating symptoms in his right arm, Dr. Wichman ordered a CT scan of the cervical spine.

Arms' insurance denied coverage for the CT scan, so he underwent x-rays instead. R. 1638, 3760–61. The x-rays revealed straightening of the normal cervical curvature with reversal at C5-C6, mild to moderate narrowing of the C3-C4 disc space, moderate narrowing of the C4-C5 disc space, mild narrowing of the C5-C6 disc space, and marked narrowing of the C6-C6 disc space with prominent anterior bone spurs. Arms met with Dr. Wichman in March 2018 to review the x-ray results. R. 3481. Dr. Wichman assessed "[r]efractory neck and right arm pain with radicular-type symptoms" and indicated that the x-rays were "consistent with significant loss of cervical lordosis and narrowing at C6 7." *Id.* He recommended "pursuing workup of the cervical spine." *Id.*

A few days later, Arms met with Farbod Rastegar, an orthopedic spine specialist. R. 3482–87. Arms told Dr. Rastegar that he had pain in his neck and shoulder that shot down his right arm into his entire hand, causing numbness and tingling. Arms underwent another cervical spine x-ray, which revealed mild reversal of cervical lordosis at C5-C6 and multilevel degenerative disc disease and bilateral neural foraminal stenosis. R. 3477. Dr. Rastegar diagnosed cervical spondylosis with radiculopathy. R. 3487.

Arms met with Igor Levin, a pain management specialist, the following month. R. 3487–92. Arms told Dr. Levin that he had right shoulder pain, some neck pain, and some weakness in his right arm. During the physical examination, Arms exhibited some weakness with hand grasping and with flexion and abduction of the right arm. Dr. Levin assessed a differential diagnosis of right shoulder pain with arthritis or radicular pain from cervical radiculopathy and administered another injection.

4

In May 2018, Arms reported to Dr. Wichman with increasing pain in his *left* shoulder. R. 3495–98. X-rays, however, were negative. Dr. Wichman provided a cortisone injection, as Arms had reported some relief from the right shoulder injections.

Arms continued to seek treatment for his shoulder and neck issues. In September 2019, he reported trouble grasping items and weakness in his upper extremities. R. 3498–3500. The treating orthopedist indicated that Arms' symptoms were not consistent with distal biceps tendinopathy. The following month, Arms told Dr. Wichman that he still had pain in his left shoulder that radiated to his left elbow. R. 3754–55. Dr. Wichman diagnosed persistent left shoulder pain, rotator cuff tendinitis, and a possible rotator cuff tear and ordered a CT scan of the left shoulder. The scan revealed an intact rotator cuff and superior labrum but notable degeneration of the cartilage within the shoulder joint. R. 4235–38. Dr. Wichman issued permanent work restrictions of lifting no more than forty-five pounds from floor to waist occasionally; lifting no more than forty pounds waist to eye level; pushing and pulling no more than fifty-five pounds; two-hand carrying no more than fifty pounds; and no repetitive overhead and away-from-body use of both shoulders.

Arms' complaints of shoulder and neck pain with radiating symptoms persisted in 2020 and 2021. In September 2020, Arms told a hand and shoulder specialist that he had ongoing shoulder pain and numbness and tingling in his hands and fingers. R. 4437–44. Electrodiagnostic testing revealed bilateral carpal tunnel syndrome and bilateral C5-C6 radiculopathy. R. 4436. The following month, Arms complained about numbness, tingling, and pain in his upper extremities that were intensified by hand and wrist motion or grasping. R. 4431. He said moving his head, neck, and shoulders also aggravated his symptoms. A nerve conduction study revealed delay of the median nerve sensory response across both wrists but

5

was otherwise normal. Thereafter, Arms continued to report issues with his neck and upper extremities. *See* R. 4610–15, 4631–34, 4651–56. His orthopedist, however, indicated that Arms did not have "significant neurocompressive pathology on the MRI that correlate[d] with [his] symptoms." R. 4612. Rather, he thought the symptoms were "more so related to the peripheral nerve entrapment syndromes." *Id.*

In October 2020, Dr. Wichman filled out a medical examination and capacity form in connection with Arms' request for disability benefits. R. 4425–30. Dr. Wichman indicated that Arms had been his patient since 2015 and that he continued to treat Arms as needed for shoulder pain. Dr. Wichman listed the following diagnoses: primary osteoarthritis of the left shoulder, chronic right shoulder pain, localized primary osteoarthritis of the right shoulder, persistent left shoulder pain, and cervical radiculopathy. He noted the same permanent restrictions assessed in November 2019. He also opined that Arms could rarely grasp, turn, and twist objects bilaterally; could occasionally perform fine finger manipulation; and would likely be absent from work more than three times per month due to his impairments.

Arms suffered from several other impairments throughout the years. For example, he exhibited memory impairment and weakness in executive functioning skills while recovering from the cardiac arrest. *See* R. 1593–98, 3347–51. He started seeing a therapist in 2019 for depression and anxiety. *See* R. 3137–49. And he's obese, with a BMI over 38 as of June 2021. *See* R. 4741. Arms has not worked since he first injured his upper extremities in 2015.

## II. Procedural Background

In late summer 2017, Arms applied for disability benefits. *See* R. 282–93, 310–32. He alleged disability beginning on the day of his workplace injury due to rotator cuff tendinitis, hypertension, high cholesterol, right shoulder and bicep tendinitis, sleep apnea, coronary

6

artery disease, ventricular fibrillation, and the need to wear a defibrillator vest. R. 283, 314. Arms asserted that he was unable to work due to limited use of his (dominant) right hand and constant pain. R. 323. According to Arms, his impairments significantly affected his ability to lift, reach, walk, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. R. 328. He also asserted that his impairments significantly affected his daily activities. For example, he reported struggling with and needing a lot of assistance with personal care, making very simple meals, and performing very few household chores. R. 324–25. Arms also reported that Dr. Wichman restricted his lifting to ten pounds rarely and less than five pounds occasionally. R. 332.

The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Arms' claim initially and upon his request for reconsideration. *See* R. 97–169. Pat Chan reviewed the medical records and found that Arms could perform the full range of sedentary exertional work. R. 108–13, 124–29. The reviewing physician at the reconsideration level, Mina Khorshidi, found that Arms could perform light exertional work with frequent but not constant overhead reaching with his right upper extremity. R. 142–47.

After the state agency denied his applications, Arms had a hearing with an ALJ employed by the Social Security Administration. *See* R. 59–96. A medical expert testified that Arms could lift and carry ten pounds occasionally, lift and carry less than ten pounds frequently, and frequently reach in all directions. R. 67. The ALJ also heard testimony from Arms and a vocational expert. In January 2020, the ALJ issued a written decision denying Arms' applications. *See* R. 22–58. A few months later, the Social Security Administration's Appeals Council denied Arms' request for review, R. 10–15, making the ALJ's decision a final

7

Case 2:22-cv-00926-SCD   Filed 09/26/23   Page 7 of 17   Document 22

decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Arms sought judicial review, and the district court remanded the matter to the Commissioner pursuant to a stipulation. *See* R. 3871–78, 3984–91. The Appeals Council vacated the 2020 decision and remanded the matter to an ALJ for rehearing. R. 3992–98.

Meanwhile, Arms filed new applications for disability benefits. *See* R. 4160–74. The state agency denied Arms' claim again. *See* R. 3922–83. The reviewing physicians, Dr. Chan and William Fowler, found that Arms could perform a restricted range of light exertional work. R. 3935–39, 3955–59, 3967–69, 3978–80.

In October 2021, Arms had a hearing with a different ALJ. *See* R. 3833–70. Arms testified at the hearing. *See* R. 3841–52. He told the ALJ that he couldn't work anymore due to issues with both shoulders and his back, neck, and heart. R. 3841–45. Arms also said that he struggled mentally since his cardiac arrest. R. 3845–46, 3850. At the time of the hearing, Arms was living with his eighteen-year-old daughter, and his oldest daughter worked as his personal care worker. R. 3847–48. He indicated that he spent most of his days in bed or watching television.

The ALJ also heard testimony from Tim Whitford, a vocational expert. *See* R. 3853–69. Whitford testified that a hypothetical person with Arms' vocational profile could work as a marker, a garment sorter, and an odd piece checker if he was limited to a restricted range of light exertional work, including occasional interaction with the public. R. 3854–60. Whitford testified that no jobs would be available if the hypothetical person missed more than one day of work each month, R. 3860, or could only occasionally perform handling bilaterally, R. 3864–68.

8

The ALJ issued a second unfavorable decision in January 2022. *See* R. 3788–3832. He considered the disability applications under 20 C.F.R. §§ 404.1520(a) and 416.920(a), which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 3792–93. The ALJ noted that Arms met the insured status requirements of the Social Security Act through September 2021. R. 3794. At step one, the ALJ determined that Arms had not engaged in substantial gainful activity since his alleged onset date, March 2, 2015. The ALJ determined at step two that Arms had six severe impairments: bilateral shoulder disorders, disorders of the neck and back, coronary artery disease, obesity, depression, and anxiety. At step three, the ALJ determined that Arms did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 3794–98.

The ALJ next assessed Arms' residual functional capacity—that is, his maximum capabilities despite his limitations, *see* 20 C.F.R. §§ 404.1545(a) and 416.945(a). The ALJ determined that Arms could work at the light exertional level[2] with several additional limitations. R. 3798. Relevant here, he found that Arms could occasionally reach overhead bilaterally and occasionally interact with the public. In assessing that RFC, the ALJ considered Arms' subjective allegations about his impairments, the medical evidence, the prior administrative medical findings, and the medical opinion evidence. *See* R. 3798–3817. The ALJ did not find persuasive Dr. Wichman's opinions about absenteeism and Arms' manipulative abilities. R. 3813–14.

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Arms was unable to perform any of his past relevant work. R. 3817–18. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Arms could perform. R. 3818–19. Relying on the vocational expert's testimony, the ALJ listed three representative jobs: marker, garment sorter, and odd piece checker. Based on the step-five finding, the ALJ determined that Arms was not disabled from his alleged onset date through the date of the decision. R. 3819.

The ALJ's 2022 decision became the final decision of the Commissioner after remand because the Appeals Council did not assume jurisdiction over the case. *See* 20 C.F.R. §§ 404.955, 404.984, 416.1455, 416.1484.

In August 2022, Arms filed this action seeking judicial review of the Commissioner's decision denying his claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7, 8. Arms filed a brief in support of his disability claim, ECF No. 11; Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, filed a brief in support of the ALJ's decision, ECF No. 20; and Arms filed a reply brief, ECF No. 21.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's

10

decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Arms contends that the ALJ erred in evaluating Dr. Wichman's October 2020 opinion. Because Arms applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for considering medical opinions. *See* R. 3798 (citing 20 C.F.R. §§ 404.1520c and 416.920c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical finding. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), (b)(2) and 416.920c(a), (b)(2). The supportability factor focuses on what the source brought forth to support his findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. §§ 404.1520c(b)(2) and 416.920c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id.*

The ALJ did not find persuasive Dr. Wichman's opinions that Arms could rarely grasp, turn, and twist objects bilaterally; could occasionally perform fine finger manipulation; and would likely be absent from work more than three times per month due to his impairments. R. 3813–14 (citing Exhibits 32F; 34F/2–7, 18–22; 36F/12–17). According to the ALJ, Dr. Wichman's opined hand and finger restrictions were "not supported by the treatment records." R. 3814. The ALJ explained that "[t]here [was] nothing in Dr. Wichman's treatment notes that indicate[d] that he treated the claimant for any hand or finger conditions." *Id.* The ALJ also noted that Dr. Wichman's assessment indicated that treatment was for the shoulders and that "no ongoing treatment [had] been required since 2018, only as needed follow up appointments." *Id.* Similarly, the ALJ determined that Dr. Wichman's opinion regarding work

12

absences was "not supported by the records and not consistent with the fact that the claimant [was] not receiving ongoing care from Dr. Wichman." *Id.*

Arms first argues that the ALJ overlooked or ignored evidence suggesting that Arms' cervical spine issues contributed to his manipulative limitations. The ALJ determined at step two that Arms' neck and back disorders significantly limited his ability to perform basic work activities. R. 3794. The ALJ also noted that x-rays revealed straightening of the normal cervical curvature at the C5-C6 level and marked narrowing of the C6-C7 disc space. R. 3802–03 (citing Exhibit 27F/11). And the ALJ observed that Arms' "surgeon opined the claimant's [upper extremity] symptoms were related to a cervical spine problem." R. 3801 (citing Exhibit 23F/7). Arms maintains that the ALJ failed to consider this evidence when evaluating the supportability and consistency of Dr. Wichman's October 2020 opinion.

Kijakazi accuses Arms of speculating about a possible link between his cervical spine issues and Dr. Wichman's opined handling and fingering limitations. Arms' argument, however, is not based on mere speculation—Dr. Wichman was the surgeon who made that connection. In January 2018, Dr. Wichman assessed radiculitis after Arms reported numbness and tingling down his right arm. R. 1647. At a follow-up appointment several weeks later, Dr. Wichman suggested that the findings of a recent cervical spine x-ray were consistent with Arms' reported neck and arm pain with radicular-type symptoms. R. 3481.

Thus, while the ALJ correctly noted that Dr. Wichman primarily treated Arms' shoulder issues, substantial evidence does not support the ALJ's conclusion that Dr. Wichman's treatment notes do not support his opined handling and fingering limitations. Those notes show that Dr. Wichman was aware of Arms' complaints of radiating symptoms down his right arm, and, as the ALJ acknowledged earlier in his decision, Dr. Wichman

13

believed those symptoms were related to Arms' cervical spine issues. Dr. Wichman also listed cervical radiculopathy as one of Arms' diagnoses on the October 2020 assessment. *See* R. 4426. The ALJ, however, failed to consider the connection between Arms' cervical spine issues and his alleged limitations handling and fingering when addressing the supportability of Dr. Wichman's opinions.

The record contains other evidence linking Arms' radiating symptoms to his cervical spine issues. In March 2018, Dr. Rastegar diagnosed cervical spondylosis with radiculopathy after Arms complained about pain, numbness, and tingling shooting down his right arm into his entire hand and after reviewing updated x-rays. R. 3482–86. Arms continued to complain about similar symptoms throughout 2018, 2019, and 2020. He reported some weakness in his right arm, R. 3487; trouble gripping items, R. 3498; radiation down to his left elbow, R. 3754; moving his hand and wrist or grasping intensified his upper extremity symptoms, R. 4431; numbness and tingling in his fingers, R. 4436; neck pain that radiated into his arms and hands, R. 4612; and chronic bilateral hand stiffness and tingling, R. 4651. Arms also was diagnosed with carpal and radial tunnel syndrome during that time. *See* R. 4612. Although the ALJ mentioned some of this evidence in his decision, he failed to address whether it was consistent with Dr. Wichman's opined handling and fingering limitations. In fact, the ALJ did not give any examples of evidence inconsistent with those opinions. *See* R. 3841 (ALJ concluding that Dr. Wichman's opined limitations were not "supported by" the treatment records and discussing only Dr. Wichman's own treatment notes).

Arms also argues that the ALJ erred when evaluating Dr. Wichman's opinion about workplace absences. I agree. Arms correctly points out that the ALJ conflated the supportability and consistency factors. Recall that supportability focuses on the objective

14

medical evidence and supporting explanation presented by the medical source, while consistency focuses on a comparison to other evidence in the record. However, the ALJ here determined that Dr. Wichman's opinion was not *supported* by the treatment records and was *inconsistent* with his own treatment notes. *See* R. 3814. The ALJ never actually addressed or explained whether Dr. Wichman's absenteeism opinion was consistent with evidence from other sources.

Likewise, the ALJ failed to explain why Dr. Wichman's own treatment records did not support his opinion. The ALJ indicated that Arms was not receiving any ongoing care from Dr. Wichman at the time he completed the October 2020 assessment. Although Dr. Wichman provided more frequent care following Arms' initial injury in 2015—the record contains notes from at least fifteen visits from 2015 through 2017, *see* R. 561–706, 1639–52, 2033–55—he never stopped treating Arms. Dr. Wichman saw Arms at least five times since 2018, including for new issues with his left shoulder. *See* R. 1645–52, 3481–87, 3495–98, 3751–56, 4233–38. Indeed, as the ALJ acknowledged in his decision, Dr. Wichman was still seeing Arms for follow-up care as needed. *See* R. 3813. Substantial evidence does not support the ALJ's inference that Arms would have seen Dr. Wichman more frequently from 2018 to 2020 if his impairments were causing him that much trouble. Dr. Wichman issued permanent work restrictions in 2019 and suggested there wasn't much else he could do for Arms' upper extremity issues. *See* R. 1637–38, 4236–37.

In sum, substantial evidence does not support the ALJ's finding that Dr. Wichman failed to sufficiently support his opined limitations regarding handling, fingering, and workplace absences, and the ALJ did not address the consistency of those opinions with other evidence. Those errors were not harmless. The vocational expert at the latest administrative

15

hearing testified that no jobs would be available to a person with Arms' vocational profile and other assessed limitations if he could only occasionally perform handling bilaterally. The vocational expert also testified that employers will generally tolerate at most one absence each month. In other words, Arms likely would have been found disabled if the ALJ had adopted one of Dr. Wichman's opined limitations. *See Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021) (explaining that legal error, like that alleged here, is harmless only if the reviewing court is "convinced that the ALJ would reach the same result on remand").

Arms asks me to reverse the ALJ's decision and direct the Commissioner to award benefits. "When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge. In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits." *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018) (collecting cases). The record requires a finding of disability only when the evidence is so lopsided that it "can yield but one supportable conclusion"—that the applicant qualifies for disability benefits. *Martin*, 950 F.3d at 376 (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). This is not one of those unusual cases. The record contains evidence that potentially conflicts with Dr. Wichman's opined limitations, including Arms' physical exams, Dr. Wichman's own prior opinions, and the findings of the state-agency reviewing physicians. The appropriate remedy therefore is to remand, not to award benefits.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ reversibly erred in evaluating the October 2020 opinion of Arms' treating orthopedic surgeon. Thus, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner

16

pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 26th day of September, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge